UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

ARTHUR COFFEY *et als.*,

Defendants.

---

**ELECTRONICALLY FILED**

Crim. No. 04-651 (ILG)

Hon. I. Leo Glasser, U.S.D.J.

**SUPPLEMENTAL SENTENCING MEMORANDUM
ON BEHALF OF DEFENDANT ALBERT CERNADAS**

Jack Arseneault (JA 6292)
Steven G. Sanders (SS 2023)
ARSENEAULT FASSETT
 & MARIANO, LLP
560 Main Street
Chatham, NJ 07928
(973) 635 - 3366

Attorneys for Defendant
Albert Cernadas

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**PRELIMINARY STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**THE APPLICABLE GUIDELINES RANGE IS ZERO TO SIX MONTHS** . . . . . . . 2

   **I.**     **THERE WAS NO "INTENDED LOSS"** . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   **II.**    **THERE WAS NO "ACTUAL LOSS"** . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   **III.**   **IF THE ADJUSTED OFFENSE LEVEL EXCEEDS SIXTEEN, THEN AL SHOULD BE AFFORDED AN ADDITIONAL ONE-POINT DEDUCTION FOR ACCEPTANCE OF RESPONSIBILITY** . . . . . . . . 12

   **IV.**   **THIS COURT SHOULD AWARD AL A MITIGATING ROLE REDUCTION IF IT CONCLUDES THAT THE OFFENSE-LEVEL EXCEEDS LEVEL SIX** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

<u>Cases</u>

*United States v. Seward,*
    272 F.3d 831 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. McConaghy,*
    23 F.3d 351 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Altier,*
    91 F.3d 953 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Barbera,*
    Crim. No. 02-1268, 2005 WL 2709112 (S.D.N.Y. Oct. 21, 2005) . . . . . . . . . . . 4

*United States v. Blitz,*
    151 F.3d 1002 (9th Cir.),
    *cert. denied,* 525 U.S. 1029 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Crosby,*
    397 F.3d 103 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Daddona,*
    34 F.3d 163 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Deutsch,*
    987 F.2d 878 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Dinome,*
    954 F.2d 839 (2d Cir.),
    *cert. denied,* 506 U.S. 830 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Garcia,*
    920 F.2d 155 (2d Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Jacobs,*
    117 F.3d 82 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Marlatt,*
    24 F.3d 1005 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Muñoz Franco,*
  356 F. Supp.2d 20 (D.P.R. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Nachime,*
  121 F. Supp.2d 285 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*United States v. Oligmueller,*
  198 F.3d 669 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*United States v. Petrelli,*
  306 F. Supp.2d 449 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Prescott,*
  920 F.2d 139 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Randall,*
  157 F.3d 328 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Rothwell,*
  387 F.3d 579 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Rybicki,*
  287 F.3d 257 (2d Cir. 2002),
  *aff'd,* 354 F.3d 124 (2d Cir. 2003) (*in banc*),
  *cert. denied*, 125 S. Ct. 32 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Steich,*
  987 F.2d 104 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3


Statutes

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2


Rules

Fed. R. Crim. P. 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U.S.S.G. § 1B1.11(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

U.S.S.G. § 2B1.1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 10

U.S.S.G. § 2X1.1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

U.S.S.G. § 3B1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

U.S.S.G. § 3B1.3 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

U.S.S.G. § 3E1.1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12

U.S.S.G. § 6A1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U.S.S.G. § 6A1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Other Authorities

HAINES, BOWMAN & WOLL, FEDERAL SENTENCING GUIDELINES
HANDBOOK (West 2006)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. App. C, amend 617 (Nov. 1, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## PRELIMINARY STATEMENT

Defendant Albert Cernadas submits this Supplemental Sentencing Memorandum to address Guidelines issues raised by the draft Presentence Report ("PSR"), given the Probation Department's refusal to resolve those issues in Al's favor in its February 15, 2006 Addendum to the Presentence Report ("Addendum").

For the reasons set forth below, this Court should determine that the adjusted offense-level is six, which translates to a sentencing range of zero to six months. Further, consistent with the arguments advanced in Al's Sentencing Memorandum (Docket Entry No. 247), this Court should impose a non-custodial sentence.

## ARGUMENT

## THE APPLICABLE GUIDELINES
## <u>RANGE IS ZERO TO SIX MONTHS</u>

The Second Circuit has instructed district courts to determine, and then "consider," the applicable Guidelines range. *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). *See also* 18 U.S.C. § 3553(a)(4). The Plea Agreement correctly computes a total adjusted offense-level of 6, for a sentencing range of zero to six months, as follows:[1]

- U.S.S.G. § 2X1.1(a) directs the district court to use the Guideline applicable to the underlying substantive offense that was the object of the conspiracy (here, mail/wire fraud);

- U.S.S.G. § 2B1.1(a)(2) specifies a base-offense level of 6 for those crimes (such as conspiracy) not covered by § 2B1.1(a)(1);

- U.S.S.G. § 3B1.3(a) specifies a 2-point enhancement for abuse of position of trust; and

- U.S.S.G. § 3E1.1(a) specifies a 2-point reduction for acceptance of responsibility.

Plea Agreement at 2.

Contrary to the sentencing analysis set forth in the Plea Agreement, Probation has calculated a total adjusted offense-level of 24, producing a sentencing range of between 51 and 60 months (the statutory maximum for conspiracy). To produce this figure, Probation first calculated an actual-plus-intended loss of $3.7 million, leading to an 18-point increase in the base offense-level. U.S.S.G. § 2B1.1(b)(1)(J). (PSR ¶¶ 21, 28) Additionally, Probation refused to award any "role in the offense" reduction. (PSR ¶ 28) Finally, Probation calculated

---

[1] Probation verbally confirmed that the "PSR" employs 2004 Guidelines Manual. We have not discovered any *ex post facto* issues that would require this Court to employ a different Manual (*e.g.*, the 2001 Manual in effect on the date of the last overt act charged in the Superceding Indictment), because no other potentially applicable  Manual produces a more favorable Guidelines range. U.S.S.G. § 1B1.11(b).

a two-point reduction for acceptance of responsibility (instead of three) because Al pled guilty only on the eve of trial. (PSR ¶ 30)

We objected to PSR's conclusions on each of these three issues, but Probation's Addendum overruled our objections. As such, these issues require this Court's resolution in accordance with Federal Rule of Criminal Procedure 32(g) and U.S.S.G. § 6A1.2(c). We therefore request that this Court consider the following arguments and, to the extent the government intends to proffer evidence supporting contested Guidelines issues, conduct a sentencing hearing to resolve these disputes. *See* Fed. R. Crim P. 32(i); U.S.S.G. § 6A1.3; *see also United States v. Steich*, 987 F.2d 104, 108 (2d Cir. 1993) ("The government's burden is to establish material and disputed facts by the preponderance of the evidence."); *United States v. Prescott*, 920 F.2d 139, 143-44 (2d Cir. 1990).[2]

## I.      THERE WAS NO "INTENDED LOSS"

Over Al's objection, the PSR claims that Al intended to cause a loss of $3,275,301. According to the PSR, this intended loss figure derives from the arbitration decision issued by labor arbitrator Jonathan Sands, which concluded that MILA would have spent an

---

[2]As an initial matter, the Guidelines require a court to use "*the greater of* actual *or* intended loss." U.S.S.G. § 2B1.1 comment. (n.3(A)).  Over our objection, however, Probation has improperly aggregated the sum of its claimed actual-loss *and* intended-loss amounts. The Addendum attempts to rationalize this approach by claiming that the actual loss of $504,240 was actually a loss that Cernadas intended to cause (an assertion that, notably, appeared nowhere in the initial PSR). As such, Probation finds it perfectly appropriate to label that figure as both an actual and an intended loss which, it claims, may be added to the claimed intended loss amount of $3.275 million without running afoul of Application Note 3(a). (Addendum at 2) This is sheer sophistry. The Sentencing Guidelines distinguish between actual and intended loss (and obligate the district court to choose the higher of the two) precisely because some criminal conduct does not cause a loss. Where criminal conduct causes an actual loss (whether intended or not) but had the potential to cause a different and an even greater loss, the district court must employ the latter if the defendant intended to cause that potential greater loss. *United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir. 1997) ("We start with the fundamental dichotomy between 'actual' and 'intended' loss, and the prescription to take the higher of the two.") (citing cases)

3

additional $3,275,301 had it used GPP/VIP instead of AdvancePCS over a three-year period. As a result of this intended loss finding, the PSR calculates an eighteen-level increase in the base offense-level under U.S.S.G. § 2B1.1(b)(1)(J). This Guidelines enhancement is unsupportable in both fact and law.

The Guidelines define "intended loss" as the "pecuniary harm *that was intended to result from the offense*." U.S.S.G. § 2B1.1 comment. (n.3(A)(ii)(I)) (emphasis added). Decisional law confirms that, even in fraud cases where (unlike here) the object of the scheme is to obtain money/property from the victim, the phrase highlighted above requires proof that the defendant intended to cause the financial loss in question. *United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir. 1997) ("The significance of the defendant's acts should be measured by his intentions"); *United States v. Nachime*, 121 F. Supp.2d 285, 293 (S.D.N.Y. 2000) ("intended loss must mean what it says"). *See United States v. Oligmueller*, 198 F.3d 669, 671 (8th Cir. 1999) ("[I]ntended loss means just that – the loss the defendant intended to cause to the victim.") (quotation marks and citations omitted); *United States v. Blitz*, 151 F.3d 1002, 1009-11 (9th Cir.) (looking to the defendant's subjective intent shaped by his or her understanding of prevailing economic circumstances), *cert. denied,* 525 U.S. 1029 (1998). It is not sufficient that a particular loss could have resulted, or was reasonably foreseeable, from the offense conduct; rather, the evidence must establish that the defendant actually intended the loss at issue. *See*, *e.g.*, *United States v. Barbera*, Crim. No. 02-1268, 2005 WL 2709112, *6 (S.D.N.Y. Oct. 21, 2005) (where defendant-doctor caused his medical practice to hire Luchese soldier for no-show job, face amount of life insurance policies issued

to Luchese soldier could not be considered an "intended loss" where "there is no ... evidence here demonstrating that Barbera intended to collect the face values of the life insurance policies . . . ."). Here, the Final PSR ignores this critical intent requirement, in violation of settled case law.

Specifically, even assuming for the sake of argument that the PSR accurately describes the offense conduct (something we vigorously dispute), the PSR nevertheless fails to demonstrate that Al knew, or even suspected, that the GPP/VIP's offer was financially inferior to AdvancePCS's. Without evidence of such actual knowledge, Al could not have specifically intended to cause a monetary loss to MILA merely by virtue of his acknowledged offense conduct, *i.e.*, because he breached his fiduciary duty to investigate potential organized crime links to one of the two companies competing for the contract. *See Nachime*, 121 F. Supp.2d at 293 (limiting intended loss to Medicaid's fixed or "capped" rate because defendants who knew of that capped rate could not have intended to obtain additional monies by submitting claims in excess of the cap); *see also Oligmueller*, 198 F.3d at 671 (affirming finding of no intended loss where "[t]here is no evidence that, at the time of the fraudulent conduct, Oligmueller intended to repay anything less than the full value of the loans"). In short, to conclude that Al intended to cause MILA a financial loss to MILA merely because a labor-arbitrator concluded that GPP/VIP's offer was inferior to AdvancePCS's would be "pure speculation" which "is not permissible under the Guidelines" *United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993).

Properly focusing on the substance of Al's plea allocution instead of the offense conduct described in the PSR further undermines the PSR's "intended loss" finding. Al's allocution suggests that, while he violated his fiduciary duty to investigate potential organized crime involvement in the GPP/VIP bid, he nevertheless pushed for GPP/VIP because he subjectively and legitimately believed that GPP/VIP was the superior company. As Al indicated, "[e]ven though I had the[se] suspicions, I moved forward and pushed for this particular company. I really didn't care what they did. I ignored it."

Al's subjective belief that GPP/VIP's bid was economically superior to AdvancePCS's certainly was justified by the objective information known to him and to the other MILA trustees. That information, which Al would have introduced at trial had he not pled guilty, demonstrated the following:

- Starting as early as 1994 or 1995 Al became aware of a national controversy about, and investigations into, the practices of large Prescription Benefit Managers (PBMs). He was suspicious of the large PBMs and believed (and still believes) that, despite the promise of lower costs, there were many hidden costs. He therefore advocated "transparency" in dealing with the pharmacy benefits plan of MILA. Al genuinely believed that GPP/VIP's contract was transparent. All rebate dollars under their contract were directly payable from the manufacturer to MILA on a dollar-for-dollar basis. There was no incentive to "push" preferred drugs for GPP/VIP. Al believed this gave the MILA members the best value for their dollars. Additionally, because GPP/VIP was not owned by a manufacturer and was not the recipient of manufacturer's grants or educational dollars, it was not in any way influenced by the drug manufacturers. In contrast, all the other bidders had some incentive to cater to the manufacturers.

- After the first contracts were awarded to GPP/VIP and Express Scripts, Inc., the MILA minutes confirm many of Al's beliefs regarding the superior rebate returns to MILA through GPP/VIP. At the end of the first year, Express Scripts refused to allow the MILA auditors to review its books, which only heightened Al's suspicions and supported his position. MILA terminated Express Scripts and awarded GPP/VIP the contract for the entire country. Again, the MILA minutes contain significant praise for GPP/VIP's performance and rebate returns. Express Scripts eventually filed suit against MILA for breach of contract. That suit was litigated in federal court and

6

ultimately settled in January 2001, about nine months before the second competition between GPP/VIP and AdvancePCS for the next three-year contract. In the letter to the MILA board's co-chairmen, which was copied to all MILA trustees, the attorneys recommended settling the case with Express Scripts for $975,000, stating that: "Preliminary estimates disclose that the termination of ESI's contract has generated millions of dollars of cost savings for MILA far in excess of the 975,000 settlement amount. Co-counsel are fearful that ESI might not only discover this fact but also use it as evidence of MILA's true motive in terminating the contract—to achieve these substantial savings. It would appear from the cost analysis that MILA's termination of ESI's contract was economically prudent." This only reinforced Al's belief that the large PBMs were loaded with hidden costs and that GPP/VIP's transparency was a better way for the MILA members to receive their benefits. With GPP/VIP, MILA knew the costs as disclosed would be the only costs.

- Al was the co-chair of MILA's Pharmacy Resource Committee (PRC) and was extremely active in all the meetings. He became the most widely respected member of the MILA board when it came to pharmacy benefits. He was clearly the leader of the Union members of MILA on the Pharmacy questions. The MILA minutes reflect that the PRC was to perform an analysis of the GPP/VIP contract beginning in May 2001 (*i.e.*, before the MILA board decided to rebid a new contract). Unbeknownst to Al, the management chair of MILA ordered a new "request for proposals" without informing the PRC committee. Bids were solicited and a thorough analysis performed by the co-consultants. As a result, GPP/VIP and AdvancePCS became the finalists. AdvancePCS was a large PBM whose name was already reported in the press in connection with allegations of wrongdoing. This only heightened Al's concerns, especially since the cost differential between the two bids was small from a comparative standpoint. However, after a long PRC meeting the day before the final vote, both co-consultants had agreed to recommend GPP/VIP. On the day of the MILA vote the management co-consultant changed his position and recommended AdvancePCS. When the vote was taken, everyone (including Al) voted for AdvancePCS. After the vote, MILA agreed not to inform either company until AdvancePCS produced a contract that included all of its previously given oral promises. AdvancePCS never produced such a contract, which only heightened Al's total distrust of large PBMs. That ultimately led to the deadlock and the resulting arbitration.

- At trial, counsel for Al would have cross-examined the management co-consultant and proved that Al was correct about AdvancePCS because an actual cost analysis of AdvancePCS's performance under the MILA contract, as analyzed by a retained defense expert, demonstrated that GPP/VIP was 24.9% cheaper than AdvancePCS in its actual performance of the contract.

In sum, Al possessed substantial, objective information supporting his good-faith belief that

GPP/VIP's bid was superior to AdvancePCS's.

7

Additionally, and not insignificantly, Judge Block specifically rejected the identical "intended loss" argument the PSR advances here when sentencing Sonny Ciccone for his role in the MILA honest services fraud:

> You're talking about his intent. [Ciccone] wanted [GPP/VIP]. There's no question about it. But that doesn't mean that he intended to cost $3 million, which is what you're claiming. There's a disconnect between the arbitration determination here that you speak about and the concept of intent in terms of my sense of indented loss. In any event, that's my decision, okay?

*United States v. Ciccone*, Crim. No. 02-606 (E.D.N.Y.), June 15, 2004, Sentencing Tr. at 25. Judge Block was exactly right; the fact that Ciccone wanted MILA to award the contract to GPP/VIP does not, *ipso facto*, mean that he intended to cause MILA a $3-million loss. Moreover, Judge Block refused to attribute that loss to Ciccone even though he (unlike Al) supported GPP/VIP because of its organized-crime link, and not because of any good-faith belief that GPP/VIP had the best bid. Since Ciccone's illicit support of GPP/VIP was insufficient to attribute any intended loss to him, Al's genuine support of GPP/VIP precludes attributing any intended loss to him.

Finally, the PSR ignores the fact that the government, prior to the guilty plea, did not believe that Al's conduct intended to cause a financial loss to MILA. Gov't Reply Br. [Docket Entry No. 123] at 5 (omitting any discussion of intended loss). Similarly, in opposing Cernadas' pretrial motion to dismiss the honest services prong of the mail/wire fraud conspiracy, the government repeatedly asserted that it need not establish that the conspiracy actually caused or intended to cause economic harm to MILA. Gov't Opp. Br. [Docket Entry No. 36] at 44 ("it is not necessary for the government to allege [and prove] that the funds entered the contracts on disadvantageous terms or that the fund beneficiaries

8

received inadequate service"); *id.* at 46 ("a reasonable jury could easily conclude that the contracts would not have been awarded to GPP/VIP and Compsych if those companies' connection to organized crime had been disclosed."); *id.* at 48-50 ("the *Rybicki* materiality test is sufficiently flexible to capture serious public non-economic harm such as the conduct alleged here.").

In sum, there is a clear disconnect between the honest services violation disclosed in Al's plea colloquy (failing to investigate possible organized crime involvement) and the intended loss figure calculated in the PSR (based on an arbitrator's finding that GPP/VIP's offer was inferior to AdvancePCS's). Not every mail/wire fraud offense intends to cause a financial loss. *See generally United States v. Rybicki*, 287 F.3d 257, 260 (2d Cir. 2002) (affirming conviction for conspiracy to commit honest services mail/wire fraud despite government's concession that it would "not seek to prove that the amount of any of the settlements had been inflated above what would have been a reasonable range for that settlement" in absence of defendants' honest services violation), *aff'd,* 354 F.3d 124 (2d Cir. 2003) (*in banc*), *cert. denied*, 125 S. Ct. 32 (2004); *United States v. Dinome*, 954 F.2d 839 (2d Cir.) (depriving victim of right to control use of its assets is actionable despite no intent to cause victim economic harm), *cert. denied*, 506 U.S. 830 (1992). Here, Al's offense lacked any intent to cause any such loss, much less the $3.2 million intended loss found by the PSR. Indeed, the evidence overwhelmingly establishes that his support of GPP/VIP was not only genuine but objectively reasonable.

9

## II.    THERE WAS NO "ACTUAL LOSS"

The PSR also calculates an actual loss of $504,240, which represents the fees and costs associated with the arbitration. Assuming no intended loss, *see supra* Point I, an actual loss of that amount would translate into to a fourteen-point increase in the base offense-level under U.S.S.G. § 2B1.1(b)(1)(H). We object to the PSR's "actual loss" determination as well.

The Guidelines define "actual loss" as "the *reasonably foreseeable* pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 comment. (n.3(A)(i)) (emphasis added). The Guidelines further define "reasonably foreseeable pecuniary harm" as "the pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 comment. (n.3(A)(iii)). When it enacted these definitions in 2001, the Sentencing Commission imbued the actual loss calculus with both a "but for" and "proximate" cause requirement. HAINES, BOWMAN & WOLL, FEDERAL SENTENCING GUIDELINES HANDBOOK 310-11 (West 2006), citing U.S.S.G. App. C, amend 617 (Nov. 1, 2001). The "actual loss" the PSR attempts to attribute to Al fails both prongs of this test.

The PSR assumes without explanation that a deadlock-breaking arbitration was "a result of the offense." As set forth above, this assumption flows largely from the PSR's attempt to attribute to Al a version of the offense far broader than the one to revealed by his plea allocution (and the actual historical facts). That is, only by assuming (erroneously) that Al knew that MILA originally awarded GPP/VIP a contract solely by virtue of a mail/wire fraud conspiracy can the PSR conclude that a deadlock-breaking arbitration would have been

10

unnecessary in the absence of that conspiracy. As set forth previously, however, the "the offense" was Al's violation of his fiduciary duty to reveal his suspicions about potential organized crime involvement in the contracting process. Those suspicions arose *after* MILA had originally awarded a contract to GPP/VIP. Contrary to the PSR's unwarranted assumption, therefore, Al's breach of his fiduciary duty did not – and, indeed, could not – inexorably lead to the deadlock-breaking arbitration. *See, e.g., United States v. Rothwell*, 387 F.3d 579 (6th Cir. 2004) (holding that defendant's fraud in obtaining progress payments from SBA during construction of building was not the but-for cause of later loan default that caused a loss to the SBA). Because historical facts repudiate any suggestion that the arbitration would not have occurred but for Al's offense, the cost of that arbitration cannot be deemed an "actual loss" resulting from that offense.

Even were Al's fiduciary breach somehow deemed the but-for cause of the arbitration, it was not its *proximate* cause. As set forth previously, from Al's perspective, GPP/VIP was a credible vendor with a meritorious proposal. In fact, the evidence strongly supports a belief on Al's part that any costs MILA incurred from having to arbitrate the dispute ultimately would have been offset by the increased savings to MILA from the arbitrator choosing GPP/VIP instead of AdvancePCS. Although the arbitration award found for AdvancePCS, the historical evidence of AdvancePCS's performance, as explained above, suggests that GPP/VIP's proposal was financially more lucrative than AdvancePCS's. This is not a case where the defendant breached his fiduciary duty by voting in favor of a vendor he knew was inferior to the other vendor under consideration. Here, in stark contrast, Al breached his

11

fiduciary duty even though he genuinely believed GPP/VIP had the best bid (and substantial, objective evidence supported his belief). For that reason, the PSR simply fails to articulate how Al's conduct more probably than not caused an expense to MILA that it otherwise would not have incurred. *See*, *e.g.*, *United States v. Randall*, 157 F.3d 328 (5th Cir. 1998) (holding that defendant's bankruptcy fraud did not cause short-sale losses and foreclosure expenses because the government agencies involved would have suffered those losses anyway); *United States v. Daddona*, 34 F.3d 163 (3d Cir. 1994) (holding that costs incurred by mortgagee in completing real estate development were not attributable to fraudulent conduct committed in connection with performance bonds under which mortgagee was not obligee); *United States v. Marlatt*, 24 F.3d 1005 (7th Cir. 1994) (holding that defendant's fraudulent representations regarding the quality of title did not force title insurance company $565,000 spent by the in purchasing insured condominium units was not a "loss" caused by ); *see generally United States v. Seward*, 272 F.3d 831 (7th Cir. 2001) (holding that district court improperly included victim's attorneys' and executor's fees in the loss calculation under the Guidelines). Absent any evidence suggesting that Al's offense proximately caused the arbitration, the cost of that proceeding cannot be deemed an "actual loss" resulting from his offense.

## III.   IF THE ADJUSTED OFFENSE LEVEL EXCEEDS SIXTEEN, THEN AL SHOULD BE AFFORDED AN ADDITIONAL ONE-POINT DEDUCTION FOR ACCEPTANCE OF RESPONSIBILITY

The PSR awards Cernadas a two-point reduction under U.S.S.G. § 3E1.1(a) for acceptance of responsibility. However, proceeding under the (erroneous) assumption that the

adjusted offense-level equals or exceeds 16, the PSR goes on to note that Al is not entitled to an additional one-level reduction under U.S.S.G. § 3E1.1(b) because he pled guilty on the eve of trial. (PSR ¶ 30) Although this issue would be rendered moot were this Court to agree that there was no actual or intended loss (because Al's adjusted offense-level would not equal or exceed 16), we object to the PSR's refusal to recommend an additional one-point reduction for two reasons.

First, the government did not initiate any plea negotiations with Al until the week prior to trial. Second, the government proceeded to trial against three additional codefendants, all of whom were charged in Count Two with conspiracy to commit mail/wire fraud, and two of whom were additionally charged in Count One with conspiracy to commit extortion. Thus, it is inconceivable that the government was forced to engage in unnecessary trial preparation simply because Al did not plead guilty until one week before trial. *See generally United States v. McConaghy*, 23 F.3d 351, 353-54 (11th Cir. 1994) (noting that timeliness is a factual question and that "[a]voiding trial preparation and the efficient allocation of the court's resources are descriptions of the desirable consequences and objectives of the guideline. They are not of themselves precise lines in the sand that solely determine whether notification was timely"); *cf. United States v. Altier*, 91 F.3d 953, 958-59 (7th Cir. 1996) (affirming district court's decision not to award extra one-point reduction for acceptance of responsibility in spite of fact that codefendant went to trial where many more of the charges pertained to defendant, forcing government to devote significant amount of time to preparing defendant's case for trial).

13

## IV.   THIS COURT SHOULD AWARD AL A MITIGATING ROLE REDUCTION IF IT CONCLUDES THAT THE OFFENSE-LEVEL EXCEEDS LEVEL SIX

Paragraph 28 of the PSR recognizes that "Cernadas, while a president of Local 1235 and a trustee of the Funds, did not possess supervisory or discretionary authority over other participants[.]" Draft PSR ¶ 28 (emphasis omitted). In spite of that recognition, however, the PSR goes on to conclude summarily that Al's "knowledge of the fraudulent scheme was too great to deem him a minor or minimal participant. As such, neither an aggravating nor a mitigating role adjustment is warranted." Although this objection would be rendered moot were the district court to find no loss (and, thus, settle on a final adjusted offense-level of six), we object to the PSR's refusal to award an offense-level reduction under U.S.S.G. § 3B1.2 for several reasons.

Guidelines section 3B1.2 provides for a 2-, 3-, or 4-point reduction in the offense-level if the defendant was minor or minimal participant in the offense. While 4-point reductions are to be awarded "infrequently," 2- or 3-point reductions depend on the facts of each case. The Second Circuit looks to factors such as "the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." *United States v. Garcia,* 920 F.2d 153, 155 (2d Cir.1990).

Here, even if one assumes, *arguendo*, that the Indictment accurately described the overall "venture" or "criminal enterprise," Al's actions, on this record, clearly do not disqualify him from a minor role reduction. As argued above, there is no proof (let alone

proof by a preponderance of the evidence) that Al was a knowing participant in a larger scheme by which the Genovese family sought to take control of the ILA. Rather, Al obtained his positions within the Local and the International through popular support with the rank and file. The most Al knew (or should have known) is that persons affiliated with Gambino family (*i.e.*, "wise guys from Brooklyn") had become involved in the bidding process for a particular contract. By not acting on his suspicions, Al may have advanced the larger goals of the charged conspiracy, but that does not mean that he knew what those goals were. And, as set forth previously, Al believed in good faith that GPP/VIP's bid was superior to AdvancePCS's, which easily explains his forceful advocacy on behalf of GPP/VIP's bid. *See United States v. Petrelli*, 306 F. Supp.2d 449, 452-53 (S.D.N.Y. 2004) (noting that court had awarded the defendant a minor role reduction and explaining that "[u]nder the Sentencing Guidelines, minimal participation is evidenced by a defendant's lack of knowledge or understanding of the scope and structure of the scheme and of the activities of others"); *see also United States v. Muñoz Franco*, 356 F. Supp.2d 20, 53 (D.P.R. 2005) (awarding minor role reduction in a bank fraud case where the defendant "performed a 'limited function' similar to that of 'a defendant who is convicted of a drug trafficking offense whose role in that offense was limited to transporting or storing drugs . . . .'") (quoting U.S.S.G. § 3B1.2 comment. (n.3(A)). Given the absence of any proof that Al knew of the larger scope of the charged conspiracy, he is entitled to at least a three-point deduction for mitigating role.

## CONCLUSION

For the reasons set forth above, this Court should impose a non-custodial sentence.


Dated: Chatham, New Jersey
     February 15, 2006


          Respectfully submitted,


          s/ Steven G. Sanders
          Jack Arseneault (JA 6292)
          Steven G. Sanders (SS 2023)
          ARSENEAULT FASSETT
              & MARIANO, LLP
          560 Main Street
          Chatham, NJ 07928
          (973) 635-3366

          Attorneys for Defendant
          Albert Cernadas